West Dodd Lightning Conductor Corporation v. Commissioner.
West Dodd Lightning Conductor Corp. v. Commissioner
Docket No. 10357.
United States Tax Court
1948 Tax Ct. Memo LEXIS 156; 7 T.C.M. (CCH) 374; T.C.M. (RIA) 48111; June 23, 1948
*156 Daniel A. Taylor, Esq., for the petitioner. Jackson L. Boughner, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies as follows: 1941
1942
Income Tax
$ 8,447.28 $ Declared Value
Excess-Profits Tax
1,609.80
4,349.64
Excess Profits Tax
38,654.88
125,500.89 The only issue for decision is whether the Commissioner erred in disallowing the excess over $100,000 of the deductions claimed for salaries of officers. The petitioner's war contracts for 1942 were renegotiated subsequent to the mailing of the deficiency notice herein and the petitioner's profits for that year were determined to be excessive in the amount of $100,000. The petitioner was allowed a credit of $45,593.42 pursuant to the provisions of section 3806, I.R.C., and the balance of $54,406.58 was repaid to the government. The parties agree that any adjustments made necessary by the renegotiation will be made under a Rule 50 computation. Findings of Fact The petitioner, a corporation, filed its returns for the taxable years with the collector of internal revenue at Indianapolis, Indiana. *157 The petitioner has been engaged since 1931 in the manufacture and sale of equipment for protecting buildings from lightning. 999.97 shares of its stock, each share having a par value of $100, were issued for assets in 1931. The following table shows how the stock was held during the taxable years: 1941
1942
Emma V. Hoovens
571.87
531.87
Agnes Hoovens Brooks
40
L. J. Brooks, Jr.
9
9
Frances E. Stotts
206.61
206.61
C. A. Schnoebelen
64.98
64.98
Mary G. Schnoebelen
7.60
7.60
Miller Lightning Rod Company
139.91
Total
999.97
860.06
The petitioner on November 13, 1941 acquired the shares owned by the Miller Lightning Rod Company for $7,495.50 and immediately canceled and retired those shares. Agnes is the daughter of Emma V. Hoovens and the wife of L. J. Brooks, Jr. Frances E. is the wife of E. R. Stotts. Mary G. is the wife of C. A. Schnoebelen. Frances and Mary did not take an active part in the business of the petitioner. Their stock was voted by their husbands. The board of directors of the petitioner at all times material hereto consisted of the following: Emma V. Hoovens, E. R. Stotts, C. A. Schnoebelen, L. J. Brooks, Jr., John M. *158 Cornell. Emma V. Hoovens was president and C. A. Schnoebelen was vice president during the taxable years. E. R. Stotts was made a vice president in 1942. The petitioner, prior to the taxable years, had current assets of about $40,000 to $50,000 and fixed assets of about $37,000. Its sales had ranged from $81,000 in 1936 to about $139,000 in 1940. Its net income after Federal taxes, had ranged from $2.02 in 1937 to about $3,000 in 1938. Emma V. Hoovens, prior to 1941, had received an annual salary of $3,000. C. A. Schnoebelen came with the petitioner in 1935. The largest salary received by him from the petitioner prior to the taxable years was $7,746.38 in 1940. The petitioner has never paid a dividend. At the close of 1942 it had a surplus of $6,419.66 after renegotiation, and it had a deficit at the end of each of the four preceding years. It had from 15 to 23 employees during 1939 and 1940. The petitioner began in 1940 to profit from government contracts in connection with defense projects. That business consisted principally of supplying lightning protection for completed buildings and bonding all metal work involved in buildings to house ammunition so as to eliminate the *159 danger of static electricity. The petitioner did some work of that kind itself and also manufactured and sold equipment for the use of others doing similar work. The principal part of this business was obtained during the years 1941 and 1942. The petitioner's sales amounted to about $1,216,000 in 1941 and $1,005,000 in 1942. Its net income for those years, before officers' salaries, Federal taxes, and renegotiation for 1942, amounted to about $275,000 for 1941 and $333,000 for 1942. The petitioner employed from 47 to 163 persons during 1941 and 1942. Its balance sheets for the close of the years 1941 and 1942 show fixed assets of about $45,000 to $50,000, and current assets of over $320,000. The following table shows the amount claimed on the returns for 1941 and 1942 for compensation of three officials of the company, of which deductions the Commissioner, in determining the deficiencies, disallowed all but $100,000: 1941
1942
Emma V. Hoovens
$ 52,323.99
$ 86,723.52
C. A. Schnoebelen
61,557.63
86,723.52
E. R. Stotts
52,323.99
86,723.52
$166,205.61
$260,170.56
A reasonable allowance for salaries and other compensation for personal services actually *160 rendered by Emma V. Hoovens, C. A. Schnoebelen and E. R. Stotts, during each of the years 1941 and 1942, was not in excess of $100,000. The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: The question here is - what was a reasonable allowance for salaries and other compensation for the personal services rendered to the petitioner during each of the taxable years by Emma V. Hoovens, its president, C. A. Schnoebelen, its vice president, and E. R. Stotts, who was a director during each year, a vice president during 1942, and an employee rendering valuable services during each year. The determination of this question must be made upon consideration of all of the evidence in the record. That has been done to the best of our ability and a finding has been made which decides the question. The evidence shows how a number of different companies engaged in the lightning rod business combined in 1931 to form the petitioner. The largest of those companies was one in which the husband of Emma was prominent. He died in 1933. Emma who was about 65 years of age in the taxable years, had worked with her husband doing office work and had been an assistant *161 officer of the petitioner for several years. She was general manager for a short time in 1933. She became a director in 1933 and president in 1940. She loaned money to the petitioner and assisted it in obtaining credit. The record shows what she did in such matters. She spent about six hours a day during the taxable years at the office of the petitioner. She paid all bills, signed all checks, assisted in personnel matters and conferred with Schnoebelen on other business matters. Schnoebelen was employed as vice president and general manager of the petitioner from February 1935 to his death in 1945. He was experienced in the lightning rod business. He was energetic, resourceful, ambitious and capable. He made some substantial changes in its sales methods. He was active in obtaining business directly from the government and from prime contractors for government projects during the taxable years. He designed new bonding methods and new products. He contributed materially to the success of the petitioner's business during the taxable years. He worked well beyond the usual working time during those years. Stotts had been in the lightning rod business for many years prior to 1931, but *162 had been engaged in the laundry business for about ten years prior to 1941. The petitioner employed him in January 1941 because it needed an experienced man to assist Schnoebelen. It was understood that Stotts was to be employed only during the urgency of the war contracts and he left the employ of the petitioner in April 1943 when the war work was practically over. The record shows the important services which he rendered during the taxable years and the long hours which he worked. The record also shows in some detail the services performed by other officers and employees of the petitioner. Schnoebelen entered into a written contract with the petitioner when he was employed in 1935, under which he was to have an annual salary of $3,900 and a bonus of 5 per cent of sales over $73,378. A new contract was entered into on January 27, 1940 under which his annual salary was to be $4,420 and he was to receive a bonus of 5 per cent of all sales over $73,378. That contract was to apply to 1940 and was to be renewed automatically for each subsequent year unless one party or the other gave notice of its termination on or before August 1 of the preceding year. The board of directors terminated *163 it by a notice given prior to August 1, 1941 because they felt that a salary based on sales was unsafe and they thought one based on a percentage of net profits would be safer. A new contract for 1942 was entered into on September 13, 1941 providing that Schnoebelen's annual salary should be $10,400, plus one-third of 80 per cent of the net profits of the petitioner for 1942. Stotts had been insisting that his compensation should approach that to be paid Schnoebelen, and Emma V. Hoovens had expressed the view that she should receive a similar salary, particularly in view of her assistance in financial matters. The board of directors on October 13, 1941, voted a bonus for that year to Emma V. Hoovens and E. R. Stotts, "in such an amount that the total compensation each shall receive will be an amount equal to 85% of the total compensation paid to C. A. Schnoebelen for the same period." The directors, at the same meeting, voted Emma and Stotts each a salary of $200 a week for 1942 and each a bonus equal to one-third of 80 per cent of the net profits for that year. Schnoebelen was opposed to the change in his salary and was opposed to the salaries voted to Stotts and Emma. Schnoebelen's *164 employment contract was modified on October 30, 1942 to reduce his fixed salary for subsequent years to $5,200. The record and the parties are somewhat vague on just what effect the renegotiation had upon the salaries authorized for 1942. The record does not show that the three individuals ever received salaries in other years comparable to those claimed for 1941 and 1942. Such evidence as there is on the subject indicates that their salaries in other years were only a relatively small fraction of the amounts claimed for 1941 and 1942. Practically all of the stock of the petitioner was owned either by these three or by persons closely related to them. Most of the earnings of the business were taken out in officers' salaries. No dividends were paid and apparently no consideration was given to the possibility of paying dividends. The huge profits of these two years were due largely to the impact of the war. These people took advantage of the situation and are entitled to salaries commensurate with the services which they actually rendered during the two years. It is apparent, however, that $100,000 properly divided among three would be ample for the services rendered by them. Emma *165 did not render services at all comparable to those rendered by Schnoebelen, for example. Her salary for 1942 was the same as his. It appears that a large part of the so-called salaries was in fact dividends in a poor disguise. Although not all of the evidence and not all of the arguments of counsel in the rather lengthy briefs have been discussed in this opinion, nevertheless, all of the facts in the record and all of the arguments of counsel have been carefully considered in making the finding of fact which decides this case. Decision will be entered under Rule 50.